(98 App. Div. 361)

## STENGER v. BUFFALO UNION FURNACE CO.

(Supreme Court, Appellate Division, Fourth Department. November 15, 1904.)

1. MASTER AND SERVANT—DEATH OF SERVANT—NEGLIGENCE—EVIDENCE.

In an action for death of a servant, employed to work around a blast furnace, by his being overcome by gas escaping therefrom, evidence reviewed, and *held* sufficient to establish defendant's negligence in failing to keep the furnace in proper repair.

2. SAME—PROXIMATE CAUSE.

Where, in an action for death of a servant by being overcome by gas escaping from a blast furnace at which he was employed, there was evidence that it was impossible to prevent some gas from escaping from the furnace, and it was not proved that the gas from which deceased was overcome was that which was negligently permitted to escape because of defects in the furnace, and not that that escaped in the ordinary course of operating the same, there was no proof that defendant's negligence in failing to keep the furnace in repair was the proximate cause of the death so as to justify a recovery.

Spring, J., dissenting.

Appeal from Trial Term, Erie County.

Action by Barbara Stenger, as administratrix of Joseph Stenger, deceased, against the Buffalo Union Furnace Company. From a judgment in favor of plaintiff, and from an order denying defendant's motion for a new trial on the minutes, defendant appeals. Reversed.

The action was commenced on the 25th day of July, 1903, to recover the damages sustained by the widow and next of kin of Joseph Stenger, deceased, because of his death, which occurred on the 24th day of April, 1903, resulting from injuries sustained by him on the 17th day of April previous, while in the employ of the defendant, alleged to have been caused solely through its negligence.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Frederick Haller, for appellant.

George H. Kennedy, for respondent.

McLENNAN, P. J. The defendant is a domestic corporation, and at the time of the accident which is the subject of this action was engaged in operating a blast furnace in the city of Buffalo, N. Y. The furnace, so far as it is important to note, consisted of an iron cylinder lined on the inside with fire brick, about 80 feet in height, 12 to 14

feet in diameter at the top or throat and at the bottom, and about 22 feet in diameter between those points. The material used in the production of pig iron, consisting of ore, limestone, coke, coal, etc., was conveyed in buckets up an inclined railway to the top of the furnace, and there dumped into a funnel shaped hopper, the lower edge of which extended into the throat of the furnace, where it rested upon brackets projecting from the sides, leaving a considerable space between it and the inner walls of the furnace. From an iron beam at the top of the furnace there was suspended in the hopper a large bell-shaped casting, which while the hopper was being filled, was held stationary, its lower or flare edge fitting closely against what is called a "hopper extension," which may be described as a large ring placed inside of and at the lower edge of the hopper, such bell and extension forming a bottom. The hopper was emptied by lowering the bell into or below the throat of the furnace, where, the diameter being larger, the material was allowed to fall below, and was fused by extreme heat generated at the bottom by means of what is known as the "hot blast." The molten iron was drawn off from time to time. The hopper was filled at frequent intervals, and the bell lowered, thus dumping the load upon the heated mass beneath. The furnace was of the ordinary pattern and the kind in common use. When in perfect repair, the space between the hopper at the lower edge and the walls of the furnace was solidly filled with fire brick. The smaller opening surrounding the upper edge was covered with iron plates made tight at the joints with salammoniac and iron borings. Thus gas would be prevented from escaping from between the hopper and the walls of the furnace. The hopper extension or ring referred to was intended to prevent the escape of gas into the hopper while being filled. It is necessary to provide such a furnace with what are called "explosion doors" which are forced open when the pressure of the gas inside becomes too great, thereby permitting it to escape. Such doors closed automatically, and when closed, if in proper repair, no considerable amount of gas could escape at such points. By means of a system of pipes much of the gas generated was conveyed to the boiler room or bottom of the furnace, where it was used for fuel. Some of it was also consumed by burning coals in an iron basket suspended above the hopper.

The evidence conclusively shows that in the operation of such a furnace, even when in perfect repair, and when all the means referred to are employed, a considerable quantity of gas escapes into and impregnates the atmosphere at the top. This is necessarily true of the gas emitted by the frequent explosions, and which forces the "explosion doors" open, and also as to that which escapes, if not consumed by the coal fire, when the bell is lowered, which practically uncovers the furnace. To protect the workmen engaged in filling the hopper against such escaping gas, a shanty for them to enter was constructed on a platform at the top of the furnace. Provision was also made for frequently shifting or changing the men so engaged; it being fully understood that it was unsafe for any one to inhale the air at the top of the furnace for any considerable length of time, especially when the wind was blowing from a certain direction. On the night of the accident plaintiff's intestate was engaged with a fellow workman in

·emptying buckets into the hopper. He had worked there for four nights previously, and was familiar, in a general way, with the method ·of doing the work. ·While thus employed, he was overcome by gas, fell into the hopper, and sustained injuries from which he died a week later. Previous to the night in question no one of defendant's employés had been injured by escaping gas, but upon that night two other of defendant's employés were thus injured, although no change had taken place in the furnace for a considerable time prior to the accident.

The evidence introduced on behalf of the plaintiff tended to show that the brickwork between the lower edge of the hopper and the walls of the furnace was cracked and broken, and that the plates covering the space at the upper edge were warped, and out of place; that thus gas was permitted to escape from around the hopper; also that the "hopper extension" or ring which was intended to fit closely around the flare edge of the bell was broken, and in such condition that gas could escape into the hopper while it was being filled; also that the "explosion doors," so called, were out of repair, and in such a condition that gas could escape around them when closed; that they would open too easily, and when thrown open by the force of the explosion would not close automatically, as they were intended to do. While the evidence which tended to establish such facts was contradicted by the defendant, it was of such a character as to raise a question of fact as to those issues, and to justify the jury in finding that the defendant was negligent in respect to the matters adverted to.

The serious question presented by this appeal is whether or not there is any evidence which tends to show that any gas escaped because of either of the defects referred to, and from which injury to plaintiff's intestate resulted. It is well settled that, in order to entitle a plaintiff to recover in an action of this character, it is incumbent upon him to show that the negligence of the defendant was the proximate cause of the injury. In this case the burden rested upon the plaintiff to prove that the gas which overcame plaintiff's intestate escaped because of the defendant's neglect. We think she failed to sustain such burden. There is no evidence which tends to prove that at the time of the accident the "explosion doors" opened because of their defective condition, or that they were not opened in the regular way, and precisely as they would have been if the defects complained of had not existed; and, if so opened, there is nothing to indicate what amount of gas escaped from them, or what effect it had upon the air at the top of the furnace. If they were opened properly, only because of the great pressure exerted upon them from within the furnace, and plaintiff's intestate was injured by the gas which was thus permitted to escape, clearly the defendant would not be liable. Again, the evidence fails to show what amount of gas, if any, escaped from around the outside of the hopper; or, if it did so escape, that the deceased inhaled any of it. So with respect to the alleged defect in the hopper extension. Did the gas which overcame the deceased come up into the hopper while it was being filled because of such defects, or did it escape immediately previous when the bell was lowered and the entire top of the furnace practically uncovered? The answer to the question cannot be found

in the evidence. Indeed, it appears that the deceased was affected to such an extent as to cause him to stagger before he reached the top of the hopper. There is no proof that any gas, or, if any, how much, escaped from the cracks or defects which were in or about the "explosion doors," or that such gas came in contact with the deceased. Upon the night in question there was gas about the top of the furnace sufficient in quantity to overcome the deceased and affect his fellow workers. Some of it was there properly and unavoidably; some of it, we may assume, was there improperly, and because of the negligence of the defendant. What proportion escaped and was present because of defendant's negligence, and whether or not it caused the injuries complained of, it is impossible to determine from the evidence. It is pure speculation to say that the gas, if any, which escaped by reason of the negligence of the defendant, caused the injuries of which the plaintiff complains, rather than the gas which was unavoidably about the top of the furnace, the presence of which was in no manner due to such negligence.

A careful examination of the entire record compels the conclusion that it fails to prove that the alleged negligence of the defendant was the proximate cause of the injuries which caused the death of the plaintiff's intestate. It may be said that under such an interpretation of the evidence a recovery could never be had in a case like the one at bar. The difficulty in making the proof, the seriousness of the accident, and the hardship resulting therefrom can in no manner change or modify the well-established rule of law that, in actions for negligence to recover for personal injuries, in order to enable the injured party or his representatives to recover it must be shown that the negligence of the defendant was the proximate cause of the injuries sustained.

No other questions are presented by the appeal which, in our opinion, would require a reversal of the judgment. It follows that the judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event.

Judgment and order reversed, and a new trial granted, with costs to appellant to abide event. All concur, except SPRING, J., who dissents.